UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDY PHONSONGKHAM,<br><br>                              Petitioner,<br><br>v.<br><br>FIDENZIO N. GUZMAN, et al.,<br><br>                              Respondents. | Case No.:  24-cv-01566-LL-MMP<br><br>**REPORT AND RECOMMENDATION RECOMMENDING THE COURT DENY PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS**<br><br>[ECF No. 1] |

This Report and Recommendation is submitted to United States District Judge Linda Lopez pursuant to 28 U.S.C. § 636(b)(1) and Civil Local Rule 72.1(c) of the United States District Court for the Southern District of California. Pending before the Court is pro se prisoner Petitioner Andy Phonsongkham's Petition for Writ of Habeas Corpus. ECF No. 1. Respondent has filed an Answer and lodged the state court record. ECF Nos. 13–15.

For the reasons set forth herein, the Court **RECOMMENDS** the Petition for Writ of Habeas Corpus be **DENIED** and **RECOMMENDS** a Certificate of Appealability not be issued.

## I.    BACKROUND AND TRIAL PROCEEDINGS

The following facts are taken from the California Court of Appeal's opinion in *People v. Andy Phonsongkham*, Appeal No. D080131. This Court presumes the state court's factual determinations are correct, absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Davis v. Ayala*, 576 U.S. 257, 271 (2015) (quoting *Rice v. Collins*, 546 U.S. 333, 338–39 (2006)).

Linda Vista 13 (LV13) is a criminal street gang that claims territory in the Linda Vista neighborhood of San Diego. Kelly Street is in the heart of LV13's territory; the sidewalks, walls, and fences that border the street are covered in LV13 gang graffiti. Tiny Locos (TLS) is a subset of LV13.

The OKB criminal street gang operates in Southeast San Diego, in an area that includes 49th Street. OKB is affiliated with a rival gang of LV13. Phonsongkham and his friend, Anthony L., are OKB members.

At around 5:30 p.m. on May 23, 2019, Anthony was standing in front of a smoke shop in LV13 territory when a van pulled up. Someone in the van said "Chino" and "go get him." Several juvenile LV13 members (including C.L. and C.C.) exited the van, walked up to Anthony, and asked if he knew where he was. Anthony answered, "I'm from OKB" and "yeah, I'm in your turf." The juveniles beat up Anthony and fled.

Minutes after the beating ended, Anthony called Phonsongkham and sent texts to him with a geographic "pin" that pointed to a location just behind the strip mall where Anthony had been assaulted. Phonsongkham texted back, "On my way!" Phonsongkham then drove from Southeast San Diego to Linda Vista—a drive that takes about 15 minutes—and arrived just before 6:00 p.m.

At the same time, shortly before 6:00 p.m., 16-year-old Carlos V. left his house in Linda Vista and joined his friends, C.L., C.C., and J.C., outside. Three minutes later, as Carlos, C.L., J.C., and C.C. were walking together down Kelly Street, Phonsongkham drove up to them in a car, screeched to a halt, yelled "fuck TLS," and started shooting. C.L., J.C., and C.C. immediately threw themselves to the ground. Carlos, who had remained standing with his back to the street, fell as shots were fired. Phonsongkham fired five shots, then sped away.

As the boys were getting up, Carlos told his friends that he had been shot. They took Carlos's jacket off and pulled up his shirt to see a bullet wound in the middle of his chest. Carlos lost consciousness. A concerned passerby, who heard the gunshots

and saw that Carlos was bleeding, pulled up to the boys in his pickup truck and told them to put Carlos inside. The passerby drove Carlos and the boys to the nearest hospital, but by the time they arrived, Carlos had already died. He had been struck with a single bullet that entered his body through the left side of his back, traveled through his left lung and heart, and exited through the right side of his chest.

The shooting happened in daylight, and several neighbors called 911 to report it. Police officers responding to the scene found four spent 9-millimeter bullet casings in the middle of the street.

One neighbor told a responding officer that his house had been hit by a bullet. When detectives examined the house, they concluded that three bullets had hit the structure, including at the fence, gate, and an exterior window. One detective described the bullet holes as "spread out."

Eyewitnesses who saw the shooter told officers he was a heavyset Asian male in his 20s wearing a white t-shirt and red-brimmed baseball cap. They described his vehicle as a small, older, gold or metallic-colored sedan of Japanese make—either a Honda, Toyota, or Mitsubishi.

After learning the decedent and his friends were LV13 gang members, investigating officers suspected the shooting was gang related. A detective checked law enforcement databases and determined that Phonsongkham had prior law enforcement contacts while driving a vehicle that matched eyewitness descriptions of the shooter's vehicle.

Another detective reviewed video footage from the surveillance cameras of a neighbor's home and a nearby school, which showed a vehicle that matched witnesses' descriptions driving down Kelly Street near the time of the shooting. The detective observed that in addition to having the features identified by eyewitnesses, the vehicle also had 10-point rims, a spoiler, and a white sticker on one window.

A detective staked out a house on 41st Street associated with Phonsongkham. When the detective arrived at the house, it was dark and there were no vehicles in the driveway. While the detective waited, he received information that Phonsongkham had prior law enforcement contacts in a 1993 Honda Accord registered to someone at the 41st Street address. He also received a screenshot of a Facebook photograph of a group that included Phonsongkham wearing a red baseball cap.

At around 9:45 p.m., the detective saw Phonsongkham pull into the driveway of the 41st Street house in an older gold Honda Accord. He was wearing a red baseball cap and a white t-shirt. He got out of the car, walked to the trunk and opened it, reached inside and appeared to rack a handgun. He took a dark-colored bag from the trunk, closed it, and entered the house through the front door. After a few seconds, lights inside the garage were turned on.

As the detective continued to wait, he received screenshots of surveillance video of the crime scene. The vehicle in the screenshots appeared to match the car Phonsongkham was driving when he arrived at the 41st Street house.

Phonsongkham remained inside the house for around 40 minutes. When he emerged, he had changed his clothing. He got in his Honda Accord and drove a few blocks before police pulled him over and took him into custody. A spent bullet casing was found inside his car on the floorboard in front of the driver's seat.

An eyewitness to the shooting was brought to Phonsongkham for a field identification. She positively identified Phonsongkham as the shooter and said she recognized his Honda Accord as the shooter's vehicle.

The Honda Accord was impounded and a crime scene specialist who processed the car collected the spent bullet casing from the floorboard as well as two cell phones that were inside the car.

Police searched the 41st Street house. They determined that Phonsongkham had been living in the garage. They found a 9-millimeter Glock handgun with a box of 9-millimeter

> ammunition between the box spring and mattress of Phonsongkham's bed. They also found a cell phone, red baseball caps, and several white t-shirts in the garage bedroom. Phonsongkham's DNA was on the handgun.
>
> A criminalist from the San Diego Police Department examined ballistic patterns on the four spent bullet casings recovered from the crime scene and the fifth casing found on the floorboard of Phonsongkham's car. She determined that all five casings had been fired from Phonsongkham's handgun.

ECF No. 14-26 at 2–6.[1]

Petitioner was charged with the murder of Carlos V. with the special circumstance it was an intentional murder perpetrated by means of intentionally discharging a firearm from a motor vehicle (Count 1); the attempted first degree murders of J.C., C.C., and C.L. (Counts 2–4); and shooting at an inhabited dwelling house (Count 5). ECF No. 14-1 at 26–30. All five counts included firearm enhancements and were alleged to have been committed for the benefit of a criminal street gang. *Id*. Petitioner was convicted on all counts as well as the firearm enhancements;[2] however, he was not convicted of the gang allegations because after the court bifurcated those allegations, the prosecution dismissed them. ECF Nos. 14-18 at 30–43; 14-1 at 181–91; 13-1 at 8. Petitioner was sentenced to life in prison without parole, plus 125 years to life, plus 13 years and 4 months in prison. ECF Nos. 14-19 at 50–53; 15-2 at 39; 14-26 at 35; 13-1 at 22; 14-24 at 12.

In February 2023, Petitioner appealed to the California Court of Appeal. ECF No. 14-23 at 51. Petitioner characterized his case as a single-issue appeal: "The sole issue

---

[1] The Court notes if "the detective [who] staked out a house on 41st Street" was Adam Schrom, he initially testified he thought "the vehicle memorialized" in "that field interview form" was a 2005 Honda Accord, not a 1993 Honda Accord. ECF No. 14-12 at 43. However, the Court does not find this difference consequential. He later testified another vehicle registered to someone in that house was a 1993, and then testified Petitioner was driving a 1993 Honda Accord. ECF No. 14-12 at 44.

[2] The jury did not reach a unanimous verdict as to whether the attempted murder charges in Counts 2–4 were premeditated. ECF No. 14-1 at 182.

presented by this appeal presents a question of first impression, at least within the context of the amount of gang evidence, if any, admissible in a criminal trial when a Penal Code section 1109 bifurcation request has been granted to the defense." ECF No. 14-25 at 6. Nevertheless, the Court reads Petitioner's argument as having several layers.

First, Petitioner argued even though the trial court bifurcated the gang enhancement, gang evidence "permeated" his trial. ECF No. 14-23 at 23. More specifically, Petitioner argued: (1) Assembly Bill No. 333 ("AB 333") (Stats. 2021, ch. 699, eff. Jan. 1, 2022) applies to his case retroactively, or (2) in the alternative, so much gang evidence was introduced in his case that it "swallowed up" the existence and intent of AB 333[3] and "resulted in gross unfairness amounting to a miscarriage of justice and a denial of due process." ECF No. 14-23 at 26.

In an argument that muddled AB 333 with California Evidence Code sections 1101(b) and 352, Petitioner said the California legislature acknowledged the prejudice inherent in gang evidence through enactment of AB 333, and the trial court should have used AB 333 as a "backdrop" against which to conduct its California Evidence Code section 352 analysis of the admissibility of gang evidence.[4] ECF No. 14-23 at 32–33. Later in his brief, Petitioner also made a California Evidence Code section 352 argument slightly divorced from AB 333, arguing generally the gang evidence's probative value was substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice, confusing the issues, or misleading the jury because the sheer quantity of the gang evidence crossed the section 352 "tipping point." ECF No. 14-23 at 41–43, 45. Petitioner argued specifically the testimony about his field interviews "had no

---

[3] Specifically, the part of AB 333 that added California Penal Code section 1109, which requires bifurcation of the trial on the gang enhancement upon request of counsel.

[4] Petitioner later argued California *courts* have also acknowledged the "inevitable" danger that jurors will misuse gang evidence. ECF No. 14-23 at 48.

relevant purpose other than to suggest propensity,"[5] and he argued more broadly the gang evidence was not relevant in a bifurcated trial because gang affiliation and activity can only be relevant to motive and intent if it shows a motive and intent to benefit the *gang*. ECF No. 14-23 at 37–40, 44, 47. Petitioner made a brief argument about the admission of gang evidence violating his constitutional due process right. ECF No. 14-23 at 49. Separately from the gang evidence, Petitioner argued he was owed 1,010 days of custody credits, not the 1,009 days reflected in the abstract of judgment.[6] ECF No. 14-23 at 50–51. Petitioner's Reply focused his argument as follows: (1) he was entitled to retroactive application of AB 333, (2) the court's admission of field contacts testimony was in error, and (3) gang evidence should have been excluded as irrelevant propensity evidence under § 352. ECF No. 14-25 at 7–17, 19–24, 24–32. Petitioner withdrew his custody credits argument in his Reply. ECF No. 14-25 at 32–33.

The California Court of Appeal denied his appeal for three primary reasons: (1) even if AB 333 was retroactive, it did not displace case law holding gang evidence may be admitted to prove substantive crimes; (2) the gang evidence was properly admitted under section 1101 to prove motive, intent, and identity; and (3) the gang evidence was properly admitted under section 352. ECF No. 14-26 at 15, 20, 33. The Court of Appeal did not consider Petitioner's withdrawn argument he was entitled to additional custody credits. ECF No. 14-26 at 33–34. The Court of Appeal nevertheless remanded because the trial court made a mathematical error when it pronounced Petitioner's sentence and listed an inaccurate aggregation of terms in the abstract of judgment. ECF No. 14-26 at 34–35. The Court of Appeal otherwise affirmed Petitioner's convictions.

---

[5] This argument was presumably made under California Evidence Code section 1101. This is also how Respondent interpreted the argument. ECF No. 14-24 at 36.

[6] Respondent argued the abstract of judgment was correct, but the trial court was mistaken in its oral pronouncement of judgment. ECF No. 14-24 at 12 n.2.

In November 2023, Petitioner appealed to the Supreme Court of California, presenting a single question: "Is Penal Code section 1109 retroactive and did the trial court prejudicially violate petitioner's right under the Due Process clauses and contravene legislative efforts to curb the admission gang evidence by admitting extensive gang evidence after granting a motion to bifurcate pursuant to Penal Code section 1109?"[7] ECF No. 14-28 at 1, 6, 29. Petitioner wove his section 352 claim throughout his AB 333 argument[8] and mentioned section 1101 in passing in a header. ECF No. 14-28 at 13.

On December 20, 2023, the Supreme Court of California denied his petition. ECF No. 14-29 at 1. Petitioner filed the Petition for Writ of Habeas Corpus now before this Court on September 3, 2024. ECF No. 1.

## II.    DISCUSSION OF PETITIONER'S CLAIMS

Petitioner raises two claims in his Petition: (1) "gang evidence permeated [his] trial, contravening Assembly Bill No. 333 and the plain meaning of Section 1109 in violation of due process," and (2) "the abstract of judgment and minute order reflect improperly calculated custody credits and must be corrected to add one day." ECF No. 1 at 13–14. As argument, Petitioner merely refiled the opening brief his counsel filed on his behalf before the California Court of Appeal. *Compare* ECF No. 1 at 13–62 *with* ECF No. 14-23. Accordingly, the Court need not restate his arguments in detail here.

---

[7] Petitioner later properly breaks this single question into two questions: "(1) Is section 1109 retroactive; and (2) Does section 1109 limit the scope of admissible gang evidence once bifurcation is granted?" ECF No. 14-28 at 7.

[8] *See, e.g.,* ECF No. 14-28 at 24–25: "In this respect, section 352 was not employed here as it was designed to be used, as a 'realistic safeguard' protecting petitioner's due process rights, because the court abused its discretion under that section in failing to substantially narrow (if not eliminate) the amount of prejudicial and tangential gang evidence relevant to the current offenses in compliance with the stated intent of the legislature when it passed AB 333 that included a bifurcation procedure . . . the motive and intent to commit the crimes must be a motive and intent to benefit the gang in order for gang evidence to be relevant to trial of the substantive crime. Those elements were not before this jury because of the bifurcation."

Respondent argues Petitioner's first claim (the "gang evidence claim") fails to present a federal question or a due process violation, and his second claim (the "custody credits claim") is unexhausted and therefore does not present a cognizable claim. ECF No. 13 at 2, 5.

## A.    Standard of Review of Habeas Claim

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court shall not grant habeas relief on a claim adjudicated on the merits in state court unless the state court's decision was (1) "contrary to" or an "unreasonable application of" clearly established federal law (as determined by the decisions of the Supreme Court) or (2) based on an "unreasonable determination of the facts" in light of the evidence presented in the state-court proceeding. *Brown v. Davenport,* 596 U.S. 118, 127 (2022) (citing 28 U.S.C. § 2254(d)). Under the "unreasonable determination" option, "a determination of a factual issue made by a State court [is] presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Under the "contrary to" option, a state court decision is "contrary to" clearly established law if it applies a rule that contradicts governing Supreme Court case law or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000) (O'Connor, J., concurring)). This standard is "difficult to meet" because AEDPA's purpose is to "guard against extreme malfunctions in the state criminal justice system," not to function as a mechanism for "ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (citation omitted). "Clearly established law" consists only of Supreme Court holdings in effect at the time of the relevant state court decision. *Howes v. Fields*, 565 U.S. 499, 505 (2012) (citation omitted). "Circuit precedent cannot refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme Court]

has not announced." *Lopez v. Smith*, 574 U.S. 1, 7 (2014) (citation modified). A state court's decision is an "unreasonable application of" clearly established federal law only if it is "one with which no fairminded jurist would agree." *Andrew v. White*, 604 U.S. 86, 92 (2025) (citing *Harrington*, 562 U.S. at 101).

Here, Petitioner has not challenged any factual findings made by the state courts. Accordingly, his Petition does not implicate 28 U.S.C. § 2254(d)(2), so the Court analyzes his Petition under the rubric of 28 U.S.C. § 2254(d)(1)—whether the state court's decision was "contrary to" or an "unreasonable application of" clearly established federal law. Because the Supreme Court of California denied his petition for review without comment, the Court looks to the California Court of Appeal's decision as the last reasoned decision from a state court. *See Wilson v. Sellers*, 584 U.S. 122, 126–27 (2018).

### B.    Claim 1: The Court Erred by Admitting Excessive Gang Evidence Under California Evidence Code Sections 1101 and 352

Petitioner argues although California's AB 333 did not go into effect until January 1, 2022 (two months after his trial and conviction), any admission of evidence under California Evidence Code sections 1101 and 352 should have been judged with AB 333 in mind. ECF No. 1 at 37–41. Petitioner was granted a bifurcated trial under (prospective) section 1109 of AB 333, but the judge nevertheless allowed admission of gang evidence, so Petitioner argues the bifurcation grant was illusory and the intent of AB 333 was left unfulfilled. ECF No. 1 at 37. Petitioner's first argument—he was entitled to prospective application of Assembly Bill 333—is not cognizable before this Court.

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (citations omitted). Thus,

1    to the extent Petitioner alleges a violation of California law (prospective or not), his claim
2    is not reviewable by this Court.[9]

3        For the same reason, Petitioner's sub-argument—evidence of field interviews and
4    other gang evidence was admitted in violation of California Evidence Code sections
5    1101(b) and 352—fails. This is an argument concerning the state's application of its own
6    laws. Petitioner, however, also makes brief mention that admission of this gang evidence
7    deprived him of his federal constitutional right of due process. ECF No. 14-23 at 49. It is
8    within the purview of this Court to assess alleged due process violations. *See Andrew*, 604
9    U.S. at 95. However, Petitioner's due process claim fails because it is not supported by
10   clearly established law, and the admission of the gang evidence did not result in a
11   fundamentally unfair trial.

12       For grant of habeas relief, the state court's decision must be "contrary to" or an
13   "unreasonable application of" clearly established federal law. Petitioner has not cited any
14   Supreme Court case law to support the state court's decision being contrary to, or an
15   unreasonable application of, clearly established federal law. Mindful of Petitioner's pro se
16   status, the Court has sua sponte considered *Andrew v. White,* 604 U.S. 86 (2025). Before
17   *Andrew*, the Supreme Court expressly avoided opining on "whether a state law would
18   violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show
19   propensity to commit a charged crime." *Estelle,* 502 U.S. at 75 n.5 (1991). Several Circuits
20   interpreted the Supreme Court's reservation in *McGuire* as a failure to clearly establish that
21   admitting other acts evidence may violate due process. *See, e.g., Mejia v. Garcia*, 534 F.3d

22   ─────────────────────

23
24   [9] The Court additionally notes the California Supreme Court has since decided the question
     of section 1109's retroactivity—and not in Petitioner's favor. *See People v. Burgos*, 548
25   P.3d 1024, 1026–27 (Cal. 2024) ("We conclude that the *Estrada* inference of retroactivity
     does not extend to section 1109. *Estrada*'s principle of statutory interpretation infers
26   retroactivity from statutory reductions in punishment, not from the type of prophylactic
     rules of criminal procedure embodied in section 1109's bifurcation provisions.
27   Accordingly, the general presumption of prospective-only application applies to section
     1109.").
28

1036, 1046 (9th Cir. 2008) (saying "admission of propensity evidence [is] not contrary to clearly established law . . . the Supreme Court had expressly reserved consideration of the issue at hand in *Estelle*") (citation modified).[10]

The Supreme Court corrected this view in *Andrew*. In *Andrew*, the habeas petitioner claimed the admission of "irrelevant" evidence concerning her extramarital affairs, general promiscuity, and provocative dress violated federal due process when presented during her state murder trial. *Andrew*, 604 U.S. at 89–90. The Supreme Court acknowledged it had never expressly "invalidate[d] a conviction for improperly admitted prejudicial evidence," but maintained nonetheless "clearly established law provide[s] that the Due Process Clause forbids the introduction of evidence so unduly prejudicial as to render a criminal trial fundamentally unfair."[11] *Id.* at 95–96.

In accordance with *Andrew*, then, this Court considers whether the introduction of gang evidence rendered Petitioner's trial "fundamentally unfair." The Court concludes it did not. First, the Court notes again interpretation of state law by state courts binds federal

---

[10] *See also Alberni v. McDaniel,* 458 F.3d 860, 863 (9th Cir. 2006) ("The Supreme Court has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith.") (citation modified); *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) ("[The Supreme Court] has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."); *Andrew v. White*, 62 F.4th 1299, 1314–16 (10th Cir. 2023) (rejecting the argument that *Payne v. Tennessee,* 501 U.S. 808 (1991), clearly establishes "a due process violation arising from ordinary evidentiary rulings at trial"); *Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020) (explaining the Supreme Court has "repeatedly rejected claims that prejudicial evidence violated due process" for habeas purposes).

[11] In *Andrew*, the Supreme Court primarily drew upon *Payne v. Tennessee*, 501 U.S. 808 (1991), for support that its *Andrew* holding was clearly established federal law. Accordingly, although *Andrew* post-dates Petitioner's conviction and appeal, the Court considers *Andrew*'s holding to be clearly established law as of 1991 (almost three decades before Petitioner's offense date). *See Williams v. Taylor*, 529 U.S. 362, 412 (2000) (saying "clearly established Federal law" refers to "the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision").

courts in habeas proceedings, and Petitioner's due process argument is simply a state law evidentiary claim packaged in "due process" box. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). There is a slim argument that *Andrew* left the door open to such claims. But the similarities between *Andrew* and the present case end there.

In *Andrew*, the state appellate court found the trial court erred in admitting some of the challenged evidence and "struggle[ed]" to find "any relevance" to the evidence. *Andrew v. State*, 164 P.3d 176, 192 (Okla. Crim. App. 2007). In other words, the habeas petitioner in *Andrew* requested federal review of the admission of evidence that *a state appellate court agreed* was admitted in error. Contrast that with the case currently before this Court, in which the California Court of Appeal assessed the trial court's admission of gang evidence under California evidentiary rules and found no error. ECF No. 14-26 at 2, 33. In light of this critical distinction and the Supreme Court's unequivocal pronouncements that a federal habeas court is bound by a state court's interpretation of state law, the Court believes this ends the inquiry.

Nevertheless, the Court assumes for the sake of argument it can supersede the California courts' interpretation of California law under *Andrew* if the Court believes the admission of the evidence rendered Petitioner's trial "fundamentally unfair." Petitioner does not put forth a persuasive argument the admission of gang evidence in his case was so "unduly prejudicial" that it rendered his trial "fundamentally unfair," nor does the Court see an argument based on the record before it. In reviewing a trial for fundamental unfairness, the Court may consider, among other things: (1) "the relevance of the disputed evidence to the charges or sentencing factors," (2) the degree of prejudice the petitioner suffered from the evidence's introduction, and (3) "whether the trial court provided any mitigating instructions." *Andrew*, 604 U.S. at 96 (citing *Romano v. Oklahoma*, 512 U.S. 1, 13 (1994)).

As outlined more completely in the opinion of the California Court of Appeal, the admitted gang evidence was extremely relevant to Petitioner's prosecution. The following gang evidence was challenged on Petitioner's appeal:

Detective Eddie Escamilla, an expert on Linda Vista gang sets, identified two active gangs in the area: LV13, and its rival gang, the Linda Vista Crips. The juveniles who assaulted Anthony were known or suspected LV13 gang members. He explained the importance to a gang of defending gang territory; targeting rival gang members who enter a gang's claimed territory; "putting in work" by backing up fellow gang members who are assaulted; and avoiding any appearance of cooperating with law enforcement, also known as "snitching," such as by talking openly with the police or testifying in court.

Detective Dan Caropreso, an expert on Asian gangs including OKB, described OKB's hand signs and tattoos, and testified that OKB claims territory in an area of Southeast San Diego that included 49th Street. He was shown five screenshots from Phonsongkham's Facebook account and testified they showed Phonsongkham "throwing" gang signs or standing next to others who were throwing gang signs, and they included an image of 49th Street.

Detective Nestor Hernandez described the mission of the gang suppression unit of the San Diego Police Department. He explained that law enforcement collected information about gang members because "they are usually involved in some type of criminal activity, either at the time that they were contacted or sometime later on."

The jury was shown numerous photographs from the cell phones recovered from Phonsongkham's garage bedroom and 1993 Honda Accord. They included at least one image of him holding a gun, possibly a Glock.

The jury also heard the following testimony about field interviews of Phonsongkham: (i) in October 2018, Officer Michael McGruder stopped Phonsongkham after seeing him with another person apparently spraying gang graffiti that said "OMC" for Oriental Mafia Crips, a sister gang of OKB (two officers testified about this field interview: Officer McGruder and his partner, Officer Adam Schrom); (ii) in November 2015, Officer Christina Berg stopped and interviewed Phonsongkham, who said he was living on 44th Street within known OKB gang territory; (iii) in April 2017, Officer Gerald Perrin conducted a

traffic stop of Phonsongkham and saw that he had a 49th Street tattoo on his left hand signifying OKB territory as well as a hat that may have been associated with OKB.

Deputy Sheriff John Barrios, who is assigned to the superior court in downtown San Diego, testified that in July 2020 (i.e., after Phonsongkham's arrest for the instant offenses), he found fresh OKB graffiti carved in the wall of a holding cell after Phonsongkham was placed in it alone while he was being transported to court.

ECF No. 14-26 at 13–14.

Petitioner challenged some of the gang evidence under California Evidence Code section 1101(b), which prohibits the use of propensity evidence absent specific circumstances or uses. Petitioner argued on appeal "officers described [him as] being involved in some type of gang activity that amounted to criminal conduct such as illegally tagging graffiti or vandalism" and Officer Perrin's testimony about Petitioner's arrest left the jury to speculate as to why he was arrested. ECF Nos. 14-26 at 18; 1 at 49. He also argued these prior acts were not similar enough to the offenses for which he was being tried to be admissible under section 1101(b).

As discussed by the California Court of Appeal, this evidence was relevant to Petitioner's prosecution. Officer Perrin's testimony about Petitioner's arrest was clearly related to his arrest for the charged misconduct.[12] ECF Nos. 14-14 at 24; 14-26 at 18–19. And the Government offered evidence of Petitioner's field interviews and holding cell graffiti to prove he was an OKB member—not for propensity purposes, but to show his

---

12    Q: Did you encounter [Petitioner] again on May 23rd into the early morning hours of May 24th, 2019?
A: Yes.
Q: And under what circumstances?
A: I like assisted as a cover unit while he was being stopped in the vehicle on South 43rd Street, and later on that day, he was arrested.

ECF No. 14-14 at 24.

motive and intent to commit the charged offenses. ECF No. 14-26 at 19–20. The prosecution's theory of the case was Petitioner (a member of OKB), shot Carlos V. (a member of rival gang LV13) in retaliation for the earlier LV13 beat-down of Petitioner's fellow OKB member, Anthony. ECF No. 14-22 at 4–7. Accordingly, evidence of Petitioner's affiliation with OKB was not only relevant to the offenses charged, but also critical to establishing Petitioner's motive and intent.

As the California Court of Appeal noted, Petitioner conceded the relevancy of his gang affiliation in his opening brief (later filed in the instant case as Petitioner's basis for habeas relief): "The People's case would be hamstrung without an ability to prove an underlying gang basis . . . in order to prove motive, identity or intent, evidence of appellant's gang membership or association with a gang, gang culture, or 'gang dynamics' as the court framed it was relevant to these matters." ECF Nos. 14-26 at 20–21; 14-23 at 44; 1 at 63. The gang evidence's relevancy to Petitioner's case stands in stark contrast to the promiscuity evidence in *Andrew*, for which several courts struggled to find non-propensity relevancy.

Also as outlined in the opinion of the California Court of Appeal, it is not clear Petitioner suffered any constitutionally meaningful degree of prejudice from the admission of the gang evidence. Nearly all evidence the prosecution seeks to introduce in a criminal trial will in some way "prejudice" a criminal defendant; accordingly, "prejudice" is not the standard. Instead, the standard is "whether a fairminded jurist could disagree that the evidence so infected the trial with unfairness" that it rendered the conviction a denial of due process. *Andrew*, 604 U.S. at 96 (citation modified). A habeas petitioner "bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005). Generally, even *improperly* admitted evidence only violates due process when there are "no permissible inferences the jury may draw from the evidence." *Alcala v. Woodford*, 334 F.3d 862, 887 (9th Cir. 2003) (citation omitted). As discussed above, there are two very important permissible inferences the jury

24-cv-01566-LL-MMP

could have drawn from the gang evidence—Petitioner had motive and intent to commit the charged offenses.

Additionally, any arguable prejudice of the gang evidence was negated by the trial court's limiting instruction. "Our legal system presumes that jurors will attend closely the particular language of limiting instructions in a criminal case and strive to understand, make sense of, and follow them." *Samia v. United States*, 599 U.S. 635, 646 (2023) (citation modified). In Petitioner's trial, the jurors were instructed in accordance with CALCRIM 1403 that "gang evidence" could only be considered for limited, enumerated purposes—and it expressly could *not* be considered to "conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." ECF No. 14-1 at 159. After review of the record, the Court has no reason to presume the jury did not follow the trial court's instructions.[13]

Finally, the Court considers the trial record as a whole. *See Romano*, 512 U.S. at 12 (concluding a court should "conduct an examination of the entire proceedings" when determining whether evidence or trial conduct "so infected the trial with unfairness as to" deny due process). The question then becomes whether, when viewed in the complete context of trial, the gang evidence admitted against Petitioner was so "unduly prejudicial" that it rendered his trial "fundamentally unfair." *Andrew*, 604 U.S. at 96. For all the reasons previously stated—the evidence's relevance to the charges, the degree of prejudice Petitioner suffered from the evidence's introduction, and the trial court's use of mitigating jury instruction—the Court thinks not.

---

[13] This is another fact that distinguishes this case from *Andrew*. In *Andrew*, the state trial court did not provide limiting instructions to the jury concerning the prejudicial evidence. *Andrew v. State*, 164 P.3d 176, 201 (Okla. Crim. App. 2007). The state appellate court found this failure to instruct to be in error. *Id.* at 205.

24-cv-01566-LL-MMP

1    Petitioner has not shown the state court's decision concerning his due process claim

2    was contrary to or an unreasonable application of established federal law, so Petitioner is

3    not entitled to habeas relief on this claim.

### C.    Claim 2: Improperly Calculated Custody Credits

5    Petitioner's second habeas claim is "the abstract of judgment and minute order

6    reflect improperly calculated custody credits and must be corrected to add one day." ECF

7    No. 1 at 13–14. Petitioner withdrew this custody credits argument in his Reply before the

8    California Court of Appeal. ECF No. 14-25 at 32–33. Accordingly, the Court of Appeal

9    did not consider the argument. ECF No. 14-26 at 33–34. By extension, neither did the

10   Supreme Court of California. *See* Cal. Rules of Court, Rule 8.500(c)(1) ("As a policy

11   matter, on petition for review the Supreme Court normally will not consider an issue that

12   the petitioner failed to timely raise in the Court of Appeal.").

13   This presents an exhaustion problem. Under 28 U.S.C. § 2254(b), exhaustion of state

14   remedies is a prerequisite to federal habeas review. *See Rose v. Lundy*, 455 U.S. 509, 515–

15   16, 522 (1982) ("[A]s a matter of comity, federal courts should not consider a claim in a

16   habeas corpus petition until after the state courts have had an opportunity to act . . . ."].

17   Exhaustion requires each of a petitioner's claim to be "fairly presented" to the state's

18   highest court. *See Castille v. Peoples*, 489 U.S. 346, 351 (1989) (citing *Picard v. Connor*,

19   404 U.S. 270, 275 (1971)). A claim has not been "fairly presented" unless the petition

20   describes both the operative facts and the federal legal theory on which the claim is based.

21   *See Duncan v. Henry*, 513 U.S. 364, 365–66 (1995).

22   When a habeas petition presents both exhausted and unexhausted claims, it is

23   considered a "mixed petition." *Rose*, 455 U.S. at 510. Before AEDPA, mixed petitions

24   were subject to dismissal in their entirety.[14] *See id.* at 515. However, once AEDPA imposed

_____

[14] Defendants portray dismissal of a mixed petition as the Court's only option. ECF No. 13-1 at 20 (citing *Rose v. Lundy* for the proposition that the "total exhaustion rule requires

a one-year habeas statute of limitations, the Supreme Court revisited the subject of mixed petitions and approved the limited use of a "stay and abeyance" procedure. *Rhines v. Weber*, 544 U.S. 269, 274–75, 277 (2005).

A district court should stay the petition while the petitioner returns to state court with his unexhausted claim(s) only when the "district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." *Rhines*, 544 U.S. at 277. In addition to good cause, any unexhausted claims must not be "plainly meritless," and the court should consider whether "the petitioner engaged in intentionally dilatory litigation tactics." *Id.* at 277, 278. Even when a stay is appropriate, a mixed petition should be stayed for a limited time, keeping in mind "the timeliness concerns reflected in AEDPA." *Id.* at 277. If a stay is *inappropriate*, "the court should allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief." *Id.* at 278.

In addition to the *Rhines* stay, the Ninth Circuit allows for a *Kelly* stay under *Kelly v. Small*, 315 F.3d 1063, 1069–70 (9th Cir. 2002). For a *Kelly* stay, "(1) a petitioner amends his petition to delete any unexhausted claims; (2) the court stays and holds in abeyance the amended, fully exhausted petition, allowing petitioner the opportunity to proceed to state court to exhaust the deleted claims; and (3) the petitioner later amends his petition and re-attaches the newly exhausted claims to the original petition." *King v. Ryan*, 564 F.3d 1133, 1135 (9th Cir. 2009). Under a *Kelly* stay, good cause is not required. *King*, 564 F.3d at 1135, 1136, 1140–41.

Because Defendants have taken the position that neither *Rhines* nor *Kelly* exists, the Court considers—without meaningful argument—how to handle Petitioner's mixed petition. Exhaustion of a claim is a requirement for federal habeas review, and Petitioner

---

the district court to dismiss petitioner containing both exhausted and unexhausted claims"). As described below, that is untrue.

has not exhausted his custody credits claim. So the Court considers whether Petitioner's petition is best dismissed or stayed.

The Court does not find Petitioner has engaged in "intentionally dilatory litigation tactics." *Rhines*, 544 U.S. at 278. He filed his Petition in September 2024, approximately eight months after the Supreme Court of California denied his petition for review. ECF Nos. 1; 14-29 at 1. Since that time, he has requested counsel twice. ECF Nos. 16; 18.

The "good cause" analysis is more difficult. The parameters of what constitutes "good cause" for a petitioner's failure to exhaust his claims in state court is not well-defined. *Dixon v. Baker*, 847 F.3d 714, 720 (9th Cir. 2017). Petitioner did not file an opposition or traverse in this case despite the Court's extension of his deadline to do so. ECF No. 19. Accordingly, the Court has no argument from him as to why he did not exhaust his claims in state court. Assuming his argument to be he mistakenly believed he had exhausted his claims, such an argument is likely insufficient. *See Wooten v. Kirkland*, 540 F.3d 1019, 1024 (9th Cir. 2008) (finding the petitioner's claimed "impression that his counsel included all of the issues raised before the California Court of Appeal in his petition before the California Supreme Court" did not constitute good cause). Moreover, Petitioner's affirmative withdrawal of his custody credits claim to the California Court of Appeal suggests he did not have good cause to believe he had exhausted his claims. His counsel withdrew the argument in writing, and the California Court of Appeal expressly acknowledged it did not consider his custody credits argument *in an opinion that Petitioner submitted to this Court*. ECF Nos. 14-25 at 32–33; 1-2 at 36–37 (with a header clearly stating "We Do Not Consider [Petitioner's] Withdrawn Claim That He Is Entitled to an Additional Day of Presentence Custody Credits"). Of course, viewed through a literal lens, Petitioner *did* have good cause not to submit his argument to the California Court of Appeal—he realized the argument was legally incorrect. ECF No. 14-25 at 33 ("[A]ppellant agrees with respondent based on the *Ravauz* and *Macklem* decisions in terms of date or [*sic*] booking versus date of arrest. Therefore, he respectfully withdraws this

24-cv-01566-LL-MMP

argument."). The Court is also mindful good cause is a requirement of a *Rhines* stay, but not a requirement of a *Kelly* stay.

Ultimately, the Court need not decide whether Petitioner had "good cause" for his failure to exhaust because Petitioner's custody credit claim is meritless. As previously discussed, federal habeas relief is available only when a petitioner is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). Alleged state law errors are not cognizable on federal habeas review. *Estelle*, 502 U.S. at 67.

Petitioner's claim only challenges the calculation of his sentence under state law (presumably California Penal Code section 2900.5), so his claim—even if it had been exhausted—would not be properly before this Court. His habeas petition cites only state case law, and the Court sees no reference to any established federal or constitutional law in his arguments at any level. ECF No. 1 at 61–62. Because even returning to state court to exhaust his custody credits claim would not help him in this Court, his unexhausted claim should be dismissed. *See Cassett v. Stewart*, 406 F.3d 614, 623–24 (9th Cir. 2005) ("We now join our sister circuits in adopting the *Granberry* standard and hold that a federal court may deny an unexhausted petition on the merits only when it is perfectly clear that the applicant does not raise even a colorable federal claim.").

## III.    CERTIFICATE OF APPEALABILITY

A petitioner may not appeal "the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court" except when "a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). When the district court "enters a final order adverse to the applicant," it must also issue or deny a certificate of appealability ("COA"). R. 11(a), Rules Governing Section 2254 Cases (2019).

A COA should issue if "the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 580 U.S. 100, 115 (2017) (citation omitted). This standard applies to the district

court's rejection of claims on the merits as well as on procedural grounds. *See id.* at 122 ("[A] litigant seeking a COA must demonstrate that a procedural ruling barring relief is itself debatable among jurists of reason; otherwise, the appeal would not 'deserve encouragement to proceed further.'") (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Habeas petitioners must make "a substantial showing of the denial of a constitutional right" to receive a COA. 28 U.S.C. § 2253(c)(2).

For the reasons set forth above, Petitioner has not made a substantial showing of the denial of a constitutional right. Therefore, no certificate of appealability should issue.

## IV.    CONCLUSION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** the District Judge issue an Order: (1) **APPROVING** and **ADOPTING** this Report and Recommendation, (2) **DENYING** Petitioner's Petition for Writ of Habeas Corpus (ECF No. 1), and (3) **DECLINING** to issue a Certificate of Appealability.

Within fourteen (14) days from the date of service of these filings and recommendations, any party may file written objections with the Court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be served and filed within fourteen (14) days after the objections are filed. The parties are advised failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838–39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

**IT IS SO ORDERED**.

Dated:  October 3, 2025

_____
HON. MICHELLE M. PETTIT
United States Magistrate Judge